Judgment rendered June 17, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,889-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

SEMAJ WILLIAMS                        Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Bossier, Louisiana
Trial Court No. 222,334

Honorable Allen Parker Self, Jr., Judge

* * * * *

LOUISIANA APPEALS AND
WRIT SERVICE                          Counsel for Appellant
By: Remy V. Starns
    Douglas D. Brown

J. SCHUYLER MARVIN                    Counsel for Appellee
District Attorney

ANDREW C. JACOBS
Assistant District Attorney

* * * * *

Before ROBINSON, HUNTER, and ELLENDER, JJ.

HUNTER, J., dissenting with written reasons.

**ELLENDER, J.**

Semaj Williams was charged with the second degree murder of Michael Hawkins. Following a bench trial, the district court found him guilty of manslaughter; he was sentenced to 38 years at hard labor. Williams now appeals his conviction, arguing the evidence offered by the state was insufficient to prove beyond a reasonable doubt that he was not acting in self-defense when he shot Hawkins. He also appeals his sentence as constitutionally excessive. For the following reasons, we affirm Williams' conviction, but remand for resentencing to comply with La. C. Cr. P. art. 873.

**FACTS**

In the early morning hours on October 3, 2023, Hawkins' home surveillance system, which included both audio and video, alerted him to a masked individual in dark clothing going into his vehicle, which was parked outside his home on Waller Avenue in Bossier City. Video showed this person opening the front driver's side door of Hawkins' car, getting spooked by noise coming from inside the house, and running away. Just a few seconds later, Hawkins is shown leaving his home, armed with what was later determined to be a .45 Taurus pistol. Gunshots can be heard, and shortly thereafter, Hawkins is seen encountering an individual later identified as Williams on the street, grabbing his arm, and escorting him into his home. While escorting Williams, Hawkins can be heard on the audio portion of the surveillance telling him, "I could have killed you!" Once in the home, Hawkins yells repeatedly, "Where is it"; then, "Give me the gun." Williams then says, "Back up, bitch." After a brief silence, four gunshots are heard. Williams is then shown immediately fleeing Hawkins' home

while Hawkins, who was clearly in great distress, moaned in pain and yelled for help. According to Hawkins' surveillance system, Williams was present in Hawkins' home for less than 41 seconds.

Police arrived around 1:35 a.m. to find Hawkins alive, suffering from gunshot wounds in his left shoulder, left arm, face, and upper chest. Officers provided lifesaving aid until the fire department arrived; Hawkins was pronounced dead when he arrived at the hospital. Detectives with the Bossier City Police Department ("BCPD") developed Williams as a suspect, making contact with him for the first time in person on the evening of October 3, when he and his mother presented themselves at BCPD. He was ultimately arrested and subsequently charged with second degree murder.

At trial, the state presented testimony from several witnesses, beginning with Alfredo Galvan, who lived on Waller Avenue, five or six houses down from Hawkins. He awoke early that morning to the sound of his dog barking and saw the light on in his mother's red Nissan Titan truck. When he went outside to investigate, he did not see anyone, but the glove compartment in the truck was open. Galvan heard gunshots and ran back inside. When the police came to his house the next day, he reported the burglary and told them nothing was missing. He testified the police collected fingerprints from the vehicle while they were there, some of which belonged to Williams. Galvan did not know Williams, nor could he say why Williams' fingerprints would have been on his mother's truck.

Sylvia Player testified she lived on Murphy Street; her uncle's 2015 Ford Edge was parked at her home on October 3. While she did not see anyone break into the vehicle that day, Player reported her uncle's wallet was missing from the vehicle, along with a tan Crown Royal bag of change

3

and a prescription for muscle relaxers. Player later identified a wallet, recovered by police at a location where Williams had been staying, as the one missing from her uncle's vehicle. She testified she did not know Williams.

Morgan Fain, a probation officer with Caddo Juvenile Services, testified Williams was on pretrial probation supervision on October 3, pending adjudication at Caddo Parish Juvenile Court for vehicle burglary. As a condition of his pre-adjudication release, Williams was ordered to wear a GPS ankle monitor. Fain was responsible for supervising Williams, which included reviewing reports generated by his GPS monitor daily, to ensure he was compliant with his release conditions. Fain testified in her experience the monitors were accurate and notified probation if they had been tampered with or lost charge.

Williams' ankle monitor report for October 3 started and ended with him at 1427 Cynthia Lane in Bossier City, the home of Shunta Thomas. The report showed him at 3237 Murphy Street (Player's house) at 12:58 a.m., 1260 Waller Avenue at 1:25 a.m., 1240 Waller Avenue at 1:26 a.m., 1237 Waller Avenue at 1:27 a.m., 1251 Waller Avenue at 1:28 a.m., 1231 Waller Avenue at 1:29 a.m., 1221 Waller Avenue at 1:30 a.m., and 1224 Waller Avenue (Hawkins' house) at 1:31 a.m. Fain had no reason to believe any person other than Williams was wearing the monitor assigned to him as there were no tamper alerts.

BCPD Detective Christopher Tuttle sought out surveillance video on Waller Avenue related to the vehicle burglaries and Hawkins' homicide. He obtained video from 1609 Dudley Lane in Bossier City, which showed three individuals walking down the street and into the yard at 1610 Dudley Lane,

4

pulling on a car's door handles, and leaving. Video from 1600 Dudley Lane allowed Det. Tuttle to get a better photo of the suspect who was wearing dark-colored Crocs, dark-colored pants, a dark-colored hoodie sweatshirt, and a black balaclava-style face mask. Det. Tuttle also obtained video from the Circle K at Barksdale and McDade, which showed Williams, whom Det. Tuttle positively identified, entering the store around 9:00 p.m. on October 2, wearing similar clothing and shoes. The hoodie worn by Williams in the video from Circle K had the words "Good Vibes" printed on the front.

When Det. Tuttle came into contact with Williams at BCPD on the evening of October 3, Williams and his mother declined to speak to him without an attorney present. Det. Tuttle did not notice any marks, scratches, or bruises on Williams at that time, nor did Williams or his mother attempt to point out any injuries to him. Det. Tuttle acknowledged on cross-examination he could not identify Williams in any of the surveillance videos except the footage from Circle K, but stated the GPS monitor reports showed Williams was present at the locations of the vehicle burglaries at the time they were reported and seen on surveillance. When Det. Tuttle was shown photographs at trial of cuts on the inside of Williams' mouth, scratches on his chest and neck, a scratch on his leg, and a scratch on his finger, Det. Tuttle testified he did not observe any such injuries on Williams while he was at the BCPD on October 3. Williams claimed these photographs were taken at his mother's house on October 3 after he shot Hawkins, but before they went to the BCPD.

Hawkins' mother, Blanchie Brown, testified her son had been living with her for the past five years or so at 1224 Waller Avenue; he was 38 years old when he died. Brown went to church between 4:30 p.m. and 5:00

5

p.m. October 2, then chose to spend the night with her daughter. Hawkins was home when she left. Brown testified she had a security camera over the kitchen window at 1224 Waller Avenue that showed a view of her driveway, which Hawkins maintained and monitored on his cell phone. After BCPD informed Brown of Hawkins' death, she was asked to identify some items found in the home—an iPhone, a gold chain, some black Crocs, and a black hoodie sweatshirt; none of the items belonged to her son. Brown confirmed Hawkins did own a handgun, but stated there were no bullet holes in her home prior to his death. She did not know Williams.

Sergeant Tim Wooten with the Bossier Parish Sheriff's Office ("BPSO") was accepted as an expert in cell phone digital forensics, without objection. He identified an iPhone believed to belong to Williams, from which he attempted to retrieve data helpful to the investigation into Hawkins' death and the vehicle burglaries. Sgt. Wooten was provided a photograph of the iPhone's home screen taken by the officers on scene at the time of its initial collection. When he attempted to retrieve data from the phone, the home screen was different, and the iPhone appeared to have been remotely wiped of any personal data at 1:03 p.m. on the afternoon of October 3. While Sgt. Wooten could not determine who performed the remote factory reset, he testified whoever did it could not have done so without the owner's iCloud username and password.

BCPD Detective Jason Warren, the lead detective in Hawkins' homicide investigation, reviewed the body camera footage of Officer Montrell Ware and Detective Steven Durr to determine what the first responding officers saw when they arrived on scene. Ofc. Ware's body camera captured him and Ofc. Watson clearing Hawkins' residence; the

6

back door was locked and no lights were on in this house when officers arrived. Ofc. Ware's body camera footage from 1:35 a.m. to 1:39 a.m. on October 3 was entered into evidence without objection.

Det. Warren then identified Det. Durr's body camera footage, which shows him finding a black balaclava-style face mask in the street on Waller Avenue, as well as a .45 shell casing in the street around 1215 Waller Avenue. The light from the surveillance camera at 1224 Waller Avenue was visible from where Det. Durr was standing in the street. Det. Durr's body camera showed officers locating a cell phone on the living room floor believed to belong to Williams. The same body camera footage showed officers finding a gold chain on the living room floor, two .45 shell casings, a black Croc shoe, bullet holes in the ceiling, a bullet hole outside the front door, a black hoodie with the words "Good Vibes" printed on the front, another .45 shell casing under the hoodie, and the .45 Taurus handgun that belonged to Hawkins on the kitchen floor. Hawkins' cell phone was found in his bedroom, plugged into a wall charger, and propped up on a shelf under the television facing his bed. Det. Durr's camera footage was entered into evidence without objection; photographs of all items recovered were also identified and entered into evidence without objection.

Det. Warren identified several photographs of Hawkins' home as it appeared when the police arrived, including views of the living room, dining room, and kitchen. Items on the bookshelf in the dining room were undisturbed; nothing was out of place or knocked over in the dining room other than a chair. In the living room, water bottles and assorted objects on the TV stand were also undisturbed; nothing in the living room appeared to have been knocked over or broken. The photographs showed a noticeable

7

amount of blood on the living room floor, the dining room floor, the front patio, and also on the living room wall by the light switch to the right of the front door. There was no blood on the kitchen floor where the gun was found. Nothing was disturbed in the hallway or in Hawkins' bedroom. All of these photographs were entered into evidence without objection.

Det. Warren identified a screenshot of the background photograph on Williams' iPhone taken by officers at the scene early that morning prior to the remote factory reset done on the afternoon of October 3. Det. Warren identified Williams as the person shown in the screenshot of the iPhone; the photograph of the phone's home screen was entered into evidence over the defense's objection.

Williams' GPS monitor indicated he started and ended his trip down Waller Avenue at 1427 Cynthia Drive, the home of his friend Shunta Thomas, where Williams had been staying after his mother kicked him out of her house. Det. Warren obtained a search warrant for that residence to look for any evidence related to the vehicle burglaries or homicide. Detectives found a wallet with a driver's license in it belonging to Sylvia Player's uncle in Thomas' bedroom.

Photographs were taken of Williams in BCPD's interrogation room under bright lights on October 3 around 10:00 p.m. No injuries are seen to Williams' hands, fingers, thumbs, arms, or on either of his legs; Williams was wearing a GPS monitor on his ankle. Det. Warren testified he saw no injuries to Williams' face or mouth at the time, and he did not recall Williams complaining of any injuries. When the photograph of Williams' neck was enlarged, Det. Warren acknowledged there may be some sort of scratch, but he was not certain. Det. Warren was unaware of any attempts

8

made by Williams or his family to report Williams as a victim of any crime. Once Williams was arrested for second degree murder and vehicle burglary, a warrant was obtained for his DNA; a buccal swab was sent to the lab for comparison with any DNA found on the scene.

On cross-examination, Det. Warren acknowledged Williams was not positively identified participating in the vehicle burglaries in any of the home surveillance footage collected. The only footage in which Williams could be positively identified was from Hawkins' residence, which showed Hawkins escorting Williams into the house following their confrontation in the street.

On redirect, Det. Warren confirmed the surveillance at Hawkins' home showed Williams at 1231 Waller Avenue at 1:29 a.m., which is across the street from Hawkins' home. He also confirmed the GPS and Hawkins' surveillance camera showed Williams entering the home with Hawkins a little after 1:31 a.m., for approximately 41 seconds before fleeing alone at 1:32 a.m. Det. Warren testified Hawkins' home surveillance recorded Hawkins telling Williams something to the effect of, "You're crazy; I could've killed you," as he escorted Williams into his house.

BCPD Officer Camille Stewart was accepted as an expert in fingerprint acquisition and examination, over the defense's objection. Ofc. Stewart testified she lifted latent prints from the front passenger door of the red Nissan Titan truck belonging to Galvan's mother; these were submitted to AFIS and found to belong to Williams. Ofc. Stewart was also able to match the prints taken following Williams' arrest with the prints taken from the truck and those obtained from AFIS. She agreed fingerprints were not timestamped, and she could not say when they were left on the red truck.

Kari Dicken, a forensic scientist at the North Louisiana Criminalistics Laboratory, was accepted as an expert in forensic DNA analysis, without objection. Dicken testified she was asked to analyze a black balaclava-style mask and a reference sample, both of which she identified. After swabbing the mouth area of the mask, she found one major DNA contributor to the mask: Williams. Two unidentifiable minor contributors were found, but those persons had only casual contact with the mask; the only person whose DNA indicated he wore the mask was Williams.

John Thomas, a forensic scientist at the North Louisiana Criminalistics Laboratory, was accepted as an expert in firearms examination, without objection. He compared the cartridge casings recovered from the scene of the vehicle burglary to reference cartridge casings he made; he concluded those from the scene matched the reference casings, all of which were fired by the .45 Taurus pistol belonging to Hawkins.

Dr. Frank Peretti, a retired Arkansas State Medical Examiner, was accepted by both parties as an expert in forensic pathology. He performed the autopsy on Hawkins and determined the cause of death to be multiple gunshot wounds, four in total. The first was caused by a bullet entering through Hawkins' left cheek at a downward trajectory; the bullet was recovered from Hawkins' upper right back. This wound showed no evidence of close-range firing—no muzzle imprint, no soot residue, no stippling to the skin. The second wound was caused by a bullet entering the upper left chest cavity at a slightly upward trajectory, piercing the left lung, and exiting the upper left back; no evidence showed this gunshot was fired from close range. The third bullet entered the top back part of the left

shoulder, traveling in a slightly downward trajectory, and exited at the front of the left shoulder. Again, there was no evidence this shot was made at close range. The fourth wound was caused by a bullet going through the bottom of the left forearm in an upward trajectory, exiting the top of the left forearm. This wound did have some stippling, so it was possibly fired from a closer range than the others.

Dr. Peretti testified Hawkins had some abrasions or scrapes on his forehead and his knee, likely from a terminal collapse. He noted no bruises or abrasions on Hawkins' hands. Dr. Peretti refused to give an opinion as to how Hawkins may have been standing relative to the ground based on the bullet wounds; he simply could not make any such determination.

On cross-examination, Dr. Peretti agreed the fatal injury was the second gunshot wound to the upper chest, with its slightly upward trajectory and then exiting Hawkins' body. Dr. Peretti testified the body was unclothed when he received it, and agreed if the clothing had stippling on it, it could serve as evidence of a possible close-range gunshot wound. When asked about the bullet holes in the ceiling, Dr. Peretti agreed the upward wounds and bullet holes in the ceiling could be consistent, but reiterated the bullet's trajectory could have been significantly altered by traveling through Hawkins' body, so he could not determine where Williams was positioned in relation to Hawkins at the time of the shooting.

The defense called BCPD Detective Steven Durr, who assisted in collecting evidence from Hawkins' home. Det. Durr testified he was responsible for putting trajectory string through the bullet holes in the ceiling, but stated he could not tell where the gun was fired from based on their location. He testified anytime a bullet hits anything, including a human

11

body, the trajectory changes, making it impossible to determine where the shooter was when the gun was fired.

BCPD Detective Connor Ballard, the on-call investigator who responded to Hawkins' home on October 3, testified he collected a projectile lying on top of the insulation in the attic, near one of the bullet holes in the ceiling. He collected it and turned it over to one of the CSI detectives. Det. Ballard identified photographs of the bullet holes, as well as photographs Williams claimed were taken after he shot Hawkins, but prior to his arrival at BCPD; the photographs he identified were entered into evidence without objection.

The defense's final witness was Williams himself. He testified he was living with his mother and grandmother on October 3, but, because they kicked him out of the house, he was staying the night with his friend, Shunta Thomas, who lived at 1427 Cynthia Lane. He was walking down Waller Avenue early that morning when he was confronted by Hawkins, who accused him of being with someone who broke into his car. Hawkins had a gun in his right hand and was yelling at him, repeatedly asking him who broke into his car. Hawkins grabbed Williams' right arm with his left hand and made him return to his house with him. Williams did not remember hearing any gunshots before he encountered Hawkins.

When he got to Hawkins' house, Williams claimed Hawkins took him into his bedroom, where he sat on the bed while Hawkins pulled the surveillance footage up on his phone and showed it to him, repeatedly asking him who was burglarizing his vehicle. When he could not tell Hawkins who the men in the surveillance footage were, Hawkins pulled him off the bed and brought him back into the living room. Somehow Williams ended up on

the floor, with Hawkins standing over him choking him with both hands. While being choked, Williams reached around, grabbed the gun, and shot Hawkins four times. Williams said he feared for his life. When questioned further, Williams claimed Hawkins punched him in the face while he was seated on the bed in Hawkins' room, which resulted in a busted lip. Williams was shown the photographs, which he claimed were taken after he shot Hawkins, but prior to his arrival at BCPD; he pointed to his busted lip, scratches on his chest he attributed to Hawkins, and fingernail marks he said were caused by Hawkins choking him.

On cross-examination, Williams stated several times he feared for his life, but he was unable to recall many details about his encounter with Hawkins, especially when those details would not benefit him. Williams stated he was not burglarizing vehicles, but could not say why his GPS monitor showed him at every burglary location at the time those burglaries were recorded on surveillance cameras. Williams testified he did not take a wallet from a vehicle at Sylvia Player's house, but he could not say how the wallet taken from that vehicle came to be at 1427 Cynthia Lane, where he was staying that night. Williams denied burglarizing the red Nissan truck at Galvan's house, but could not say why his fingerprints were found on the front passenger door of that truck. He acknowledged his sweatshirt was found at Hawkins' house, and stated he ran from Hawkins' house to 1427 Cynthia Lane wearing only his shorts; he could not say where the shirt he wore into Hawkins' home was, but he denied throwing it away because it was covered in blood. Williams could not recall if the black balaclava-style mask found in the street was his, but denied wearing it on the night Hawkins was killed; he could not explain why his DNA was present on the mask.

13

Williams acknowledged he went back to 1427 Cynthia Lane after he shot Hawkins, but he could not remember who took him to his mother's house later on, or who brought him to 1427 Cynthia Lane to begin with. Williams agreed he left his iPhone at Hawkins' house, but when asked who remotely wiped the phone, he could not say who would have been able to do that; he just knew it could not have been him. When asked why he ran after shooting Hawkins, Williams stated after he shot Hawkins, Hawkins kept coming toward him.

At the close of evidence, the trial court elected to issue its ruling at a later date. When the verdict was rendered a few weeks later, the court noted Williams was on a GPS ankle monitor, which, when considered along with the video surveillance located by detectives, proved Williams was one of the three young men seen on various surveillance cameras burglarizing vehicles on Waller Avenue and the surrounding streets in the early morning hours on October 3. The trial court stated it saw no defensive injuries in any of the photographs taken of Williams at the police station, and it thoroughly discussed the recordings made by Hawkins' home surveillance system. When Hawkins realized Williams had taken control of the firearm, Hawkins could be heard asking where the gun was and demanding its return before Williams fired the gun four times. The trial court found Williams' testimony lacking in credibility; the events as described by Williams simply could not have taken place. Finally, the trial court rendered its verdict, finding the evidence supported a conviction for the lesser and included offense of manslaughter.

At sentencing, the defense filed a motion for post-verdict judgment of acquittal, arguing the state failed to prove beyond a reasonable doubt

Williams had not acted in self-defense. The state responded, arguing Hawkins' lawful detainment of Williams after he saw him burglarizing his vehicle met the criteria for a citizen's arrest, thus preventing Williams from making any self-defense claims. The trial court again stated it did not believe Williams' testimony, finding his version of all that transpired within Hawkins' home could not have taken place in such a short amount of time. The motion was denied, and the trial court proceeded immediately to sentencing, imposing 38 years at hard labor. A motion to reconsider sentence was filed, which the district court denied. Williams now appeals his conviction and sentence.

## DISCUSSION

Williams argues the evidence presented was insufficient to convict because the state failed to prove beyond a reasonable doubt he was not acting in self-defense. In the alternative, Williams argues the 38-year sentence imposed by the trial court was excessive. Williams asks this court to reverse his conviction for manslaughter and render a judgment of acquittal, finding the state failed to prove beyond a reasonable doubt the homicide was not committed in self-defense or in prevention of a forcible felony; or, in the alternative, vacate his sentence and remand for resentencing with instructions to impose a sentence that properly accounts for the mitigating factors present.

### *Insufficient Evidence*

Williams argues the state improperly relied on the citizen's arrest doctrine to legitimize Hawkins' actions, and contends Hawkins could not have effectuated a lawful citizen's arrest because the state did not prove Williams was engaged in the commission of a felony. If Hawkins did not

know for certain a felony was committed by Williams, the arrest was unlawful, making Hawkins' actions forcible felony crimes. If Hawkins was engaged in such conduct, then Williams would not be precluded from arguing self-defense. As support, Williams points to the "Stand Your Ground" law, arguing because he was not engaged in unlawful activity and was in a place he was legally allowed to be, he had no duty to retreat before using deadly force to defend himself against Hawkins when he improperly conducted a citizen's arrest.

Because he was resisting an illegal arrest, and therefore allowed to claim self-defense, Williams argues the state was responsible for proving beyond a reasonable doubt he did not act in self-defense. He claims the state offered no evidence to counter several undisputed facts, including: Williams was 16 years old and weighed about 150 pounds, while Hawkins was an adult who weighed 257 pounds; Hawkins was armed with a handgun; Hawkins had already discharged the handgun that night; Hawkins forced Williams into his residence at gunpoint; Hawkins told Williams he could have killed him; Williams testified Hawkins threatened to kill him; the shooting occurred in a darkened home; and the physical evidence showed Williams was on the floor when he fired. Williams contends under the evidence presented, a reasonable trier of fact could not come to any conclusion other than finding he was acting in self-defense when he shot Hawkins. In contrast, the state contends Williams was escaping a lawful arrest, not acting in self-defense.

We first consider the issue of citizen's arrest, and find the record supports the trial court's determination Hawkins' detention of Williams was lawful. A private person may make an arrest when the person arrested has

16

committed a felony, whether in or out of his presence.  La. C. Cr. P. art. 214.  The Louisiana Supreme Court has held a private citizen must show the person he arrested committed a felony before his actions will be excused as proper, and while proof of the arrested person's conviction of the felony would facilitate the arresting party's burden of proving the commission of the felony, proof of conviction is not a requirement.  *State v. Bickham*, 404 So. 2d 929 (La. 1981); *State v. Jones*, 263 La. 164, 267 So. 2d 559 (1972); *Keys v. Sambo's Rest., Inc.*, 389 So. 2d 1360 (La. App. 3 Cir. 10/8/80), *aff'd*, 398 So. 2d 1083 (La. 1981).

Though Williams was not ultimately tried for the vehicle burglary Hawkins witnessed, the state proved beyond a reasonable doubt Williams was participating in vehicle burglaries in the early morning hours of October 3.  Burglary is defined, in pertinent part, as the unauthorized entering of any vehicle, or other structure, movable or immovable, with the intent to commit a felony or any theft therein.  La. R.S. 14:62(A)(1).   Hawkins saw his vehicle being burglarized on his home surveillance system and immediately exited his home in search of the burglars.  Shortly thereafter, Hawkins saw a person he believed to be one of the people he saw burglarizing his vehicle.  He detained that individual, Williams, and walked him into his home, presumably to call the police, as his cell phone was plugged into the charger in his bedroom.

GPS records proved Williams was present at each home where a vehicle was burglarized, with several surveillance cameras showing vehicle burglaries committed by young men wearing black balaclava-style masks at the times Williams' monitor indicated he was present at those homes.  Williams' DNA was the major contributor on a black balaclava-style mask

17

found in the middle of Waller Avenue; his fingerprints were found on the red truck broken into at Galvan's home; the wallet taken from the vehicle at Player's home was found at the house where Williams had been staying and where his GPS monitor showed he was before and after Hawkins' killing. These facts make it very apparent Williams was participating in a string of vehicle burglaries on Waller Avenue on October 3, and we see no error in the trial court's determination that Hawkins' detainment of Williams, under these circumstances, was allowed under La. C. Cr. P. art. 214. Further, while a person has a right to resist an unlawful arrest and can use reasonable force to do so, if the arrest made is lawful, then the person arrested is obligated to submit peaceably. La. C. Cr. P. art. 220; *State v. Ceaser*, 02-3021 (La. 10/21/03), 859 So. 2d 639; *State v. Trepagnier*, 07-749 (La. App. 5 Cir. 3/11/08), 982 So. 2d 185, *writ denied*, 08-0784 (La. 10/24/08), 992 So. 2d 1033.

While we agree with the state's contention a person who kills someone while escaping a lawful arrest cannot claim he was acting in self-defense when tried for homicide, we nevertheless consider whether the state presented sufficient evidence to allow the trial court to find beyond a reasonable doubt Williams was not acting in self-defense when he shot Hawkins. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Stockstill*, 19-01235 (La. 10/1/20), 341 So. 3d 502. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with

18

a vehicle to substitute its own appreciation of the evidence for that of the factfinder. *State v. Bourgeois*, 20-00883 (La. 5/13/21), 320 So. 3d 1047; *State v. Combs*, 56,232 (La. App. 2 Cir. 4/9/25), 410 So. 3d 405, *writ not cons.*, 25-01108 (La. 2/3/26), 425 So. 3d 838; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness, in whole or in part. *State v. Brown*, 18-01999 (La. 9/30/21), 330 So. 3d 199; *State v. Morehead*, 55,825 (La. App. 2 Cir. 10/23/24), 400 So. 3d 302, *writ denied*, 24-01434 (La. 2/19/25), 400 So. 3d 932. The appellate court does not assess credibility or reweigh evidence. *State v. Kelly*, 15-0484 (La. 6/29/16), 195 So. 3d 449; *State v. Morehead*, *supra*. A reviewing court accords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So. 2d 66; *State v. Morehead*, *supra*.

A homicide is justifiable when it is committed in self-defense by one who reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). When self-defense is raised as an issue by the defendant, the state has the burden to prove beyond a reasonable doubt the defendant did not act in self-defense. La. C. Cr. P. art. 390(A); *State v. Stockstill*, *supra*; *State v. Morehead*, *supra*. The critical issue is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt the

homicide was not committed in self-defense. *Id.*, *citing State v. Matthews*, 464 So. 2d 298 (La. 1985).

Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary include the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Wells*, 14-1701 (La. 12/8/15), 209 So. 3d 709; *State v. Johnson*, 56,683 (La. App. 2 Cir. 12/17/25), 425 So. 3d 983; *State v. Crow*, 52,817 (La. App. 2 Cir. 6/26/19), 278 So. 3d 416.

The trial court heard from several witnesses whose testimony clearly established Williams was burglarizing vehicles in the early morning hours of October 3. Hawkins legally detained Williams based on his reasonable belief Williams was involved in the burglary of his vehicle, and escorted Williams into his home, where Williams took Hawkins' gun and shot him four times. The home was largely undisturbed, showing no real signs of any struggle between the two men, and no physical struggle was recorded on Hawkins' home surveillance. Williams is, however, heard telling Hawkins to back up, which is wholly inconsistent with his testimony Hawkins was standing over him, choking him with both hands around his throat. Dr. Peretti's testimony established only one wound showed any evidence of stippling; the other three showed none. Further, while there were two bullet holes in the ceiling, not one expert would even speculate as to the position of the shooters, stating it was impossible to determine the positions of Williams and Hawkins at the time of the shooting. Williams fled the scene, and he made no attempts to report a crime committed against him.

The trial court heard extensive testimony from Williams regarding his claim he shot Hawkins in self-defense; it found Williams lacked credibility, his testimony was self-serving, and his memory was convenient. Based on the evidence in the record, this finding is reasonable. Simply from a timing standpoint, it is highly unlikely for everything to have occurred as Williams described in the 41 seconds that elapsed in between when the two men went toward the house and when Williams ran away. First, the surveillance camera view is of the driveway and not of the door to the home. It would take a few seconds to enter the home once out of the view of the camera. Time would have elapsed to go through the home back to the bedroom, sit on the bed, and watch the video of the vehicle burglary on Hawkins' phone. Thereafter, it would have taken more time for Hawkins to punch Williams in the face and drag him into another room before choking him. According to Williams, he then struggled with Hawkins, took the gun from him, fired four shots, and exited the home before being seen again in the camera's view. It seems highly unlikely all of this could have occurred in only 41 seconds. Even if everything could have happened in this short period of time, there were no signs in the home supporting the physical struggle Williams described, and the photos of Williams on the evening of the shooting do not corroborate he was involved in a struggle or was choked.

We find the state met its burden to prove beyond a reasonable doubt Williams did not act in self-defense.

In addition to proving Williams did not act in self-defense, based on all the facts already summarized, the state also proved beyond a reasonable doubt Williams committed the crime of manslaughter, which is defined in part as a homicide which would be murder under either Article 30 (first

21

degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1).

### Error Patent

On review for errors patent, we find the trial court failed to observe the requirements of La. C. Cr. P. art. 873 following its denial of Williams' motion for post-verdict judgment of acquittal. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least 24 hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article, sentence may be imposed immediately. La. C. Cr. P. art. 873. Here, the trial court sentenced Williams immediately following the denial of his motion for post-verdict judgment of acquittal, but the record does not indicate Williams waived the 24-hour delay mandated by statute.

When a sentence given is statutorily required, a trial court's failure to observe the 24-hour period can be considered harmless error as the trial court had no discretion in the sentence imposed. However, as in this case, when no mandatory sentence is required, we are constrained to vacate the sentence imposed and remand the matter for resentencing due to the trial court's failure to wait the required 24 hours. *State v. Palmer*, 56,313 (La. App. 2 Cir. 7/16/25), 416 So. 3d 863, *writ not cons.*, 25-01100 (La. 2/3/26), 425 So. 3d 837. Consequently, any consideration of other sentencing issues is pretermitted, including Williams' argument the trial court's 38-year sentence for manslaughter is excessive and unsupported by the record.

22

## CONCLUSION

Semaj Williams' conviction for manslaughter is affirmed. However, because the trial court failed to wait the required 24 hours following its denial of Williams' motion for post-verdict judgment of acquittal, we vacate the sentence imposed and remand the matter for resentencing in accordance with La. C. Cr. P. art. 873.

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.**

**HUNTER, J., dissenting with written reasons.**

The State bears the baroque burden of proving beyond a reasonable doubt any killing which has occurred was not, under the narrowly tailored exceptions, somehow justified. Under these facts, I do not believe the State met its burden of proving the homicide was not committed in self-defense.

A homicide is justified when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1).

At no time was defendant the aggressor. The evidence establishes Hawkins equipped himself with a firearm and vacated his residence to confront individuals he had seen breaking into his vehicle. Once outside, Hawkins brazenly discharges his handgun. When the individuals subsequently flee, Hawkins then crossed the street from his residence to confront the unarmed defendant. The evidence establishes Hawkins forced defendant, at gunpoint, to leave the public street and enter his residence. The video/audio evidence of the interaction shows Hawkins stating, "I could've killed you," and defendant testified Hawkins did threaten to kill him.

The State prosecuted this case under the theory Hawkins made a valid Citizen's arrest. Pursuant to La. C. Cr. P. art. 214, a private person may make an arrest when the person arrested has committed a felony, whether in or out of his presence. However, Detective Jason Warren testified he was unaware of any felony defendant was committing or had committed at the time he was confronted and forced into Hawkins' residence at gunpoint. I agree.

1

I have reviewed this record, and there is no indication defendant was the aggressor at any time during the confrontation. What is an unarmed person expected to do when confronted by an angry armed stranger, ordered (at gunpoint) to leave a public street, and forced to enter an unfamiliar residence? In my mind, defendant's actions were reasonable in a situation where had no choice but to defend himself.

There can be much speculation about what happened in that house and whom to believe. However, from a *forensic standpoint*, it is indisputable defendant was positioned on the floor when he fired the gun, as evidenced by the bullets retrieved from the ceiling/attic. It is therefore illogical to conclude defendant had placed himself on the floor as Hawkins, who outweighed defendant by at least 100 pounds, approached him. The forensic evidence corroborates the details of defendant's testimony relative to the moment of shooting.

Furthermore, I strongly believe the sentence imposed is excessive. This first-time offender received a near-maximum sentence without consideration of the well-settled law: maximum or near-maximum sentences are reserved for the worst offenders who commit the worst offenses. While I understand the seriousness of the offense and how manslaughter can be considered one of the "worst offenses," there is nothing in this record to indicate this defendant, who was 16 years old, is the ideal candidate tailored for such a terminal classification.

For these reasons, I dissent. I would reverse defendant's conviction and sentence and order defendant discharged.